CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JAN 0 7 2009

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **DAVID R. BERRY,**<br>Plaintiff, | ) ) ) | Civil Action No. 1:08-cv-00005 |
| v. | ) ) ) | **MEMORANDUM OPINION** |
| **MICHAEL J. ASTRUE,**<br>**Commissioner of Social Security,**<br>Defendant. | ) ) ) ) | By: GLEN M. WILLIAMS<br>SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration.

### I. Background and Standard of Review

Plaintiff, David R. Berry, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Berry's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3). (West 2003 & Supp. 2008).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Berry filed his applications for SSI and DIB on March 11, 2005 (Record, ("R") at 4), alleging disability as of September 1, 2004, (R. at 55), due to depression, anxiety, panic attacks and bi-polar disorder. (R. at 60.) The claims were denied initially and on reconsideration. (R. at 30-39.) Berry then requested a hearing before an administrative law judge, ("ALJ"), who held a hearing on October 24, 2006, at which Berry was not represented by counsel. (R. at 40, 289-313.)

By decision dated April 16, 2007, the ALJ denied Berry's claims. (R. at 12-21.) The ALJ found that Berry met the insured status requirements of the Act for DIB purposes through December 31, 2009. (R. at 14.) The ALJ also found that Berry had not engaged in substantial gainful activity since September 1, 2004, the alleged onset date. (R. at 14.) The ALJ found that Berry suffered from a severe impairment, namely a depressive disorder, a generalized anxiety disorder and depression. (R. at 14.) The ALJ found, however, that Berry did not have an impairment or combination of impairments that met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ found that Berry retained the residual functional capacity to perform the exertional demands of simple, unskilled light work[1] which did not expose Berry to high stress. (R. at 16.) Thus, the

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or

2

ALJ found that Berry could not perform his past relevant work as custodian, landscape laborer, machine operator and muffler welder. (R. at 19.) Based on Berry's age, education, work history, residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the regional and national economies that Berry could perform, including those of cleaner, stock clerk, food service laborer, general laborer and hand packer. (R. at 20.) Therefore, the ALJ concluded that Berry was not under a disability as defined by the Act, and that he was not entitled to benefits. (R. at 20.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

After the ALJ issued his decision, Berry pursued his administrative appeals, (R. at 8), but the Appeals Council denied his request for review. (R. at 5-7). Berry then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.148 (2008). This case is before this court on Berry's motion for summary judgment, which was filed on October 24, 2008, and on the Commissioner's motion for summary judgment, which was filed on November 24, 2008.

## II. Facts

Berry was born in 1963, (R. at 55, 294), which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2008). Berry has an eleventh grade education and past relevant work experience as a

---

carrying of items weighing up to 10 pounds. If an individual can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

custodian, landscape laborer, machine operator and muffler welder. (R. at 61, 296-297.)

Berry testified that he completed the eleventh grade, but never received his high school diploma. (R. at 295.) Berry also testified that he had taken vocational classes while in school, but experienced difficulty with them, even failing a carpentry class. (R. at 295.) He stated that the last job he had performed was that of a custodian, where he cleaned floors, ran buffers and moved furniture for 10 years. (R. at 296.) Prior to that, Berry stated that he had worked as a landscape laborer where he drove trucks, and prior to that, he had worked as a yarn machine operator, where he often had to push around buggies of spools. (R. at 297.) Berry also stated that he had worked at a muffler shop installing muffler equipment. (R. at 297.)

Berry testified that he had been fired from his most recent work as a custodian due to his mental problems, whereby he had difficulty remembering his instructions. (R. at 298.) Berry noted that he was taking medications such as Effexor and Hydroxipan, in addition to medication for shoulder pain. (R. at 298.) Berry stated that a car had recently fallen on his right shoulder, breaking it and prompting him to have surgery in October 2005. (R. a 298.) Although, according to Berry, the surgery had helped alleviate pain for a few months, he stated that, at the time of the hearing, he was experiencing numbness in his hand and shoulder. (R. at 298.) He also noted that he had received another magnetic resonance imaging, ("MRI"), on his shoulder from Dr. Alvarado, explaining that he planned to undergo surgery again as soon as he was able to obtain insurance. (R. at 299.) When asked whether his shoulder or his mental

4

problems kept him from working, Berry indicated that his mental problems kept him from being able to work. (R. at 299.)

Berry was asked if his treatment was helping, to which he responded that, although the treatment had helped, he was having trouble affording his medication. (R. at 300.) In addition, Berry said he needed counseling but could not afford it. (R. at 300.) Berry stated that although he used alcohol in the past, he had not used any alcohol in over a year. (R. at 301.) When asked if he previously worked with other people, he said that he had and that he never had trouble getting along well with his co-workers. (R. at 301.) However, he stated that at his last job as a custodian, he did not get along with everyone, as he was unable to talk to his boss or the supplier. (R. at 301.) Berry stated that he would easily become upset when talking to his co-workers, however, he did not get in arguments with them. (R. at 302.)

When asked about his memory problems, Berry stated that he would forget to bring things to work with him, and he had even gone to the store with his wife, accidentally driving off without her. (R. at 302.) Berry noted that these type of memory problems occurred regularly, and thus he avoided driving. (R. at 302.) Berry also noted that because of his condition, he had lost interest in activities and doing things. (R. at 302.) It also was noted that Berry had been to the emergency room several times where he described his problem as being depressed. (R. at 302.) Berry stated that he often had crying spells, which worsened when his house was relocated. (R. at 303.)

5

When asked to describe his emergency room visits, Berry stated that he would become very upset and numb, noting that his mouth would dry up and he would have to blow into a paper bag. (R. at 303.) Berry testified that he did not do household chores. (R. at 304.) Berry indicated that a typical day consisted of staying on the couch or in bed, noting that he was afraid to go outside. (R. at 303.) He stated that when people stopped by to see him, he would not even go to the door. (R. at 303.)

The ALJ next examined Berry's wife, Kathlyn Berry. (R. at 306.) She testified that her husband was extremely nervous and withdrawn, and that he did not leave the house for any reason, not even to see friends. (R. at 306.) She even stated that her husband would not see his best friend. (R. at 306.) Mrs. Berry testified that her husband's treatment would have been more effective if he could have afforded to continue the treatment. (R. at 306.) However, she stated that because she does not have insurance at her job, they are unable to afford additional treatment. (R. at 306.) Mrs. Berry testified that whenever her husband's condition worsened, he would simply go to the emergency room. (R. at 307.) She testified that his last treating doctor was Dr. Alvarado at Saltville Medical Center, whom she hoped would "hang in there with us." (R. at 308.)

With regard to Berry's ear, nose and throat problems, Mrs. Berry stated that the Bristol Medical Center diagnosed him with sinusitis, and although he has taken numerous antibiotics, surgery would be required to correct it. (R. at 308.) Mrs. Berry acknowledged that her husband has already had shoulder surgery, but may need to have a second operation performed by Dr. Alvarado. (R. at 309.) She also testified

6

that, in the past, her husband had threatened to hurt himself. (R. at 309.) She stated that the movers had accidentally broken their mobile home in half, indicating that they "are a little bit homeless." (R. at 309.) She also stated that her husband was under extreme stress. (R. at 310.)

Donna Bardsley, a vocational expert, also was present and testified at Berry's hearing. (R. at 310-312.) Bardsley classified Berry's past relevant work as a custodian as medium[2] and unskilled work and his work as a landscape laborer as heavy[3] and unskilled. (R. at 310.) In addition, his work as a yarn machine operator and muffler welder was classified as medium and semi-skilled. (R. at 310.) Bardsley was asked to consider a hypothetical individual of Berry's age, education and work history who could perform light work, but who could do only simple, low stress unskilled jobs, and jobs that would not require him to be exposed to high production quotas, nor would he be able to work with the general public on a regular basis. (R. at 310-11.) Bardsley testified that such an individual could perform work as a cleaner, stock clerk, food service worker, general laborer and hand packager. (R. at 311.) Bardsley was next asked to consider the same individual, but to assume that due to the claimant's mental impairments, the individual had a Global Assessment of Functioning, ("GAF"), score

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c), 416.967(c) (2008).

[3] Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work. *See* 20 C.F.R. § 404.1567(d), 416.967(d) (2008).

of 50,[4] and to assume that the claimant had, at least moderately severe impairments in his ability to concentrate and persist at work tasks, in addition to social interaction and in dealing with work stresses. (R. at 311.) Bardsley stated that there would be no jobs at that level of impairment. (R. at 311-312.)

In rendering his decision, the ALJ reviewed records from Dr. Laramie Triplett, M.D.; Johnston Memorial Hospital; Dr. Joseph M. Rupe, M.D.; Center for Behavioral Health; Dr. Manjit Vohra, M.D.; Joseph Leizer, Ph.D., a state agency psychologist; Julie Jennings, Ph.D., a state agency psychologist; William E. Stanley, M.Ed., a psychologist; Dr. Melvin K. Heiman, M.D., an orthopedic surgeon; Abingdon Ear, Nose & Throat Associates; Dr. Thomas Boeve, M.D.; Saltville Medical Center ("Saltville"); Highlands Ear, Nose & Throat Surgical Group; and Dr. Alvarado, M.D.

Following Berry's alleged onset date of September 1, 2004, Dr. Laramie C. Triplett, M.D. treated Berry from September 2004 through February 2005. (R. at 153.) On September 20, 2004, Berry presented to Dr. Triplett complaining of right sided chest pain, with concerns that it might be a problem with his heart. (R. at 153.) Dr. Triplett found no Gastrointestinal, ("GI"), upset or food intolerance, no pain with deep

---

4 The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates that the individual has "[s]erious symptoms… or any serious impairment in social, occupational, or school functioning…." DSM-IV at 32.

breath, no cough or dyspnea and no fever or chills. (R. at 153.) Dr. Triplett diagnosed Berry with chest wall pain, which he noted was probably benign. (R. at 153.)

On September 29, 2004, Berry returned to Dr. Triplett complaining of continued right-sided chest pain underneath the pectoralis. (R. at 152.) Berry was concerned that it might be a problem with his stomach, as he had recently eaten something sweet, which seemed to exacerbate the problem. (R. at 152.) While Berry did note some heartburn and indigestion, he did not experience nausea, vomiting or diaphoresis. (R. at 152.) In addition, he noted no pain in his back or abdomen and had no diarrhea or urinary complaints. (R. at 152.) Dr. Triplett diagnosed Berry with chest wall pain and possible epigastric pain. (R. at 152.)

On December 9, 2004, Berry again presented to Dr. Triplett for a checkup to obtain a release in order to go back to work. (R. at 151.) Berry noted that he had difficulty with substance abuse and had been trying to get into an inpatient program, but did not qualify for various reasons. (R. at 151.) Berry had been treated briefly as an inpatient at a facility in Lebanon, but had been very dissatisfied with the program and the facilities. (R. at 151.) Berry stated that he was anxious to get back to work, partly to keep himself occupied and partly to avoid financial problems. (R. at 151.) Dr. Triplett noted that Berry had a history of recent substance abuse, but was making efforts at remaining clean and sober. (R. at 151.)

On January 17, 2005, Berry presented to Dr. Triplett for a follow-up and refill on his medications. (R. at 151.) Berry reported doing fairly well on Pexeva, although

he continued to have some mild anxiety. (R. at 151.) Berry reported some continued difficulties with feeling anxious and nervous, noting a history of panic attacks. (R. at 150.) Berry stated that he had been in the emergency room about week and a half prior to this visit with flu-like symptoms and was treated with a 10-day course of Amoxicillin. (R. at 150.) Upon examination, Dr. Triplett noted no overt signs of anxiety, panic or depression, and she diagnosed Berry with anxiety disorder and a history of substance abuse. (R. at 150.)

On February 7, 2005, Berry returned to Dr. Triplett complaining of a relapse of substance abuse. (R. at 149.) Berry stated that his abuse had created significant family problems causing him to contemplate suicide. (R. at 149.) Berry stated that he had considered attempting to smoke enough drugs to kill himself and that he had also thought of shooting himself. (R. at 149.) He stated that he had previously tried to arrange inpatient treatment, but had no success. (R. at 149.) Dr. Triplett noted that Berry appeared depressed, thus she spoke with an emergency worker at Highlands Community Services in the hopes to arrange inpatient treatment. (R. at 149.)

Berry sought treatment from Johnston Memorial Hospital from October 24, 2004, through October 29, 2004, for episodes of substernal chest pain. (R. at 180.) Berry also noted his abuse of crack cocaine and crystal methamphetamine. (R. at 180.) With regard to his chest, Berry noted that for more than a month he had experienced episodes of mid to left-sided chest pain, which he described as sharp pain associated with shortness of breath and occasional diaphoresis. (R. at 180.) Berry noted that his chest pain was brought on by his crack and methamphetamine use. (R. at 180.) Dr.

Joseph M. Rupe, M.D., noted that Berry's serial enzymes and electrocardiograms, ("EKG") were unremarkable. (R. at 181.) He stated that Berry subsequently underwent exercise and nuclear stress testing on October 29, 2004, which revealed no evidence of ischemia with ejection fraction of 59 percent. (R. at 181.) Dr. Rupe recommended that Berry follow up with Dr. Triplett in two weeks, in addition to attending an intensive outpatient rehabilitation program beginning November 1, 2004. (R. at 181.)

In September 2005, Berry returned to Johnston Memorial Hospital on three different occasions for various ailments. (R. at 249-252.) On September 12, 2005, Berry was diagnosed with having an anxiety attack and with gastroesophageal reflux disease, ("GERD"). (R. at 249-250.) On September 18, 2005, Berry was diagnosed with depression for which he was prescribed medication. (R. at 251.)

From February 7, 2005, through February 20, 2005, Berry underwent inpatient treatment at the Center for Behavioral Health for alcohol, cocaine and methamphetamine use, in addition to generalized anxiety disorder and depression. (R. at 207.) Berry had been prescribed Paxil and Buspar by Dr. Triplett, however, he noted that nothing had been effectively controlled. (R. at 207.) Berry complained of decreased sleep, irritability, crying spells, depressed mood, anhedonia, decreased concentration and decreased memory. (R. at 207.) In addition, Berry had recently contemplated suicide. (R. at 207.) Berry admitted that he never tried to take care of his alcohol or substance abuse problem by going to any detox or rehab program. (R. at 207.) Berry did not specify the amount of alcohol he drank, but he stated that he

11

smoked cocaine and methamphetamine daily. (R. at 207.) Berry noted an incident the previous year where he had been at a friend's place smoking cocaine when he started experiencing chest pains and had to go to the emergency room for treatment. (R. at 207.)

On February 20, 2004, Berry was discharged by Dr. Manjit Vohra, M.D., and Berry was prescribed Effexor and Seroquel. (R. at 204.) It also was recommended that Berry attend counseling, as well as alcoholics anonymous, in addition to going back to his wife. (R. at 205.) Berry's final diagnosis was alcohol dependence in early remission, methamphetamine dependence in early remission, cocaine dependence in early remission, generalized anxiety disorder, major depression, nonpsychotic, moderate and panic disorder without agoraphobia. (R. at 206.) Dr. Vohra noted that Berry had a GAF score of 50. (R. at 206.)

On April 12, 2005, Joseph Leizer, Ph.D., a state agency psychologist, completed a mental residual functional capacity assessment form. (R. at 212-214.) Leizer noted that Berry was not significantly limited in his ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to make simple work-related decisions, to ask simple questions or request assistance, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation and to set realistic goals or make plans

12

independently. (R. at 212-213.) Leizer found that Berry was moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 213.) In addition, Leizer opined that there was no evidence of a limitation in Berry's ability to accept instructions and respond appropriately to criticism from supervisors. (R. at 213.)

Leizer noted that, based on the evidence of record, Berry's statements were only partially credible. (R. at 231.) Leizer additionally noted that the restrictions resulting from the impairment were such that Berry would be unable to meet the basic mental demands of competitive work on a sustained basis. (R. at 231.) Leizer opined that Berry had a substance abuse disorder in addition to his other medically determinable impairment, and if he discontinued the substance abuse, his remaining functional limitations would no longer be disabling within 12 months of the onset date. (R. at 231.)

On July 22, 2005, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"). (R. at 232-37.) Jennings diagnosed

Berry with affective disorder, anxiety disorder and substance addition disorder. (R. at 232.) Jennings defined Berry's affective disorder as a disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by decreased energy, feelings of guilt or worthlessness and difficulty concentrating or thinking. (R. at 235.) Jennings defined Berry's anxiety-related disorder as "the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week." (R. at 237.) Jennings defined Berry's substance addiction disorder as "behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system." (R. at 237.)

Jennings also completed a mental residual functional capacity assessment form. (R. at 245-48.) Jennings opined that Berry was not significantly limited in his ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 245-46.) Jennings opined that Berry was moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to interact appropriately with the general public, to

14

ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriately precautions, to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others. (R. at 245-46.) Jennings determined that Berry was markedly limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 246.)

Jennings opined that, based on the evidence of record, Berry's statements were only partially credible. (R. at 248.) Jennings stated that the restrictions resulting from the impairments were such that Berry would be unable to meet the basic mental demands of competitive work on a sustained basis. (R. at 248.) Jennings also stated that Berry had a substance abuse disorder in addition to his other medically determinable impairment. (R. at 248.) However, Jennings opined that if Berry discontinued the substance abuse, his remaining functional limitations would no longer be disabling. (R. at 248.)

On January 11, 2006, William E. Stanley, M.Ed., performed a psychological consultative examination of Berry. (R. at 253.) Berry was noted to be cooperative throughout the interview section of the evaluation. (R. at 253.) Berry denied the current and past use of tobacco and he denied the current use of alcohol. (R. at 253.)

15

Berry denied current use of street drugs, reporting that he quit heavy use of methamphetamine and crack cocaine about four months ago prior to this visit. (R. at 253.) Berry did report some blurred vision and he was noted to be slow and lethargic. (R. at 253.) Although Berry appeared to be shy, he appeared to understand instructions given to him. (R. at 253.)

Berry stated that his medical and other problems started during childhood, as he had a seizure disorder, for which he treated with Phenobarbital. (R. at 254.) Berry stated that he had been free of seizures for a good while. (R. at 254.) He also stated that he had encountered difficulty with depression for about 10 years, which caused him to "cry and mope around all the time." (R. at 254.) In addition, he stated that he had trouble with his memory and concentration, as well as shoulder and heart problems. (R. at 254.) Berry noted that he had been seeing Dr. Triplett for his general health and Dr. R. Semidei for his psychiatric difficulties. (R. at 254.)

Stanley observed Berry to be alert and oriented. (R. at 255.) He was able to name the current and one past President of the United States. (R. at 255.) He completed simple mathematics problems, but was unable to adequately interpret proverbs. (R. at 255.) He was able to repeat three words from a three-word list immediately following presentation and one of the three words after five minutes. (R. at 255.) He was able to repeat five of 11 sets of numbers presented to him in a serial manner. (R. at 255.) Stanley noted that Berry appeared to be a person of borderline intellectual functioning who was emotionally depressed and anxious. (R. at 255.) With regard to his clinical symptoms, Stanley noted that Berry had varied sleep, varied

16

appetite, irritability, loss of interest in previously enjoyed activity, excessive worry, racing thoughts, social isolation, anxiety, crying spells, self-injurious behavior, nightmares and stage dreams, feelings of helplessness and hopelessness and suicidal ideation within the past seven days. (R. at 255.)

Berry reported being able to do light household chores with rest breaks between tasks. (R. at 255.) He stated that he generally rose around 9:00 a.m., had breakfast, rested, sat around the house, had supper, sat around the house, visited with his wife and kids and went to bed around 11:00 p.m. (R. at 255.) Stanley noted Berry's social skills to be adequate, despite appearing shy and reserved. (R. at 255-56.) Stanley opined that due to Berry's previous experiences in finances, he did not have the judgment necessary to handle his own financial affairs. (R. at 256.)

Stanley diagnosed Berry with polysubstance abuse in full remission by Berry's report; major depressive disorder, recurrent without psychotic features (mild to moderate); panic disorder without agoraphobia (moderate); memory impairment, recent and remote (moderate); and borderline intellectual functioning, estimate based on vocabulary, fund of knowledge and educational level. (R. at 256.) Stanley additionally assigned Berry a GAF score of 50. (R. at 257.)

Stanley completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (R. at 259-61.) Stanley found that Berry had a moderately limited ability to understand and remember short, simple instructions, as well as detailed instructions, to make judgments on simple work-related decisions, to respond

17

appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (R. at 259-60.) Stanley found that Berry had between slight and moderate limitations in his abilities to interact appropriately with the public, with supervisors and with co-workers. (R. at 260.) Stanley additionally found that Berry was slightly limited in his ability to carry out short, simple instructions, as well as detailed instructions. (R. at 259.)

On October 27, 2005, Dr. Heiman, an orthopedic surgeon, performed an arthroscopy with debridement of the subscapularis, repair of a partial rotator cuff tear, partial synovectomy and subacromial decompression of Berry's right shoulder. (R. at 270-271.) Berry returned on November 8, 2005, for a follow-up appointment where Dr. Heiman opined that he was "doing reasonably well." (R. at 266.) Berry did not return to Dr. Heiman again until February 15, 2006, after missing several appointments. (R. at 264.) Berry reported a burning pain mostly over the anterior aspect of the proximal humerus. (R. at 264.) Upon examination, Dr. Heiman found that the surgical wound had healed very well. (R. at 264.) Dr. Heiman found that the x-rays were unremarkable, as the shoulder was stable and Berry was neurovascularly intact. (R. at 264.)

On August 30, 2006, Berry sought treatment at Abingdon Ear, Nose & Throat Associates for sinus pain. (R. at 276.) Berry complained of pain behind his eye and pressure of the sinuses. (R. at 276.) After going to the emergency room, he was started on Cipro, but upon completion, he did not feel any better and was switched to Augmentin. (R. at 276.) Computerized Axial Tomography, ("CT"), scans performed

on his sinuses showed extensive sinusitis with complete opacification of the right maxillary sinus and right frontal sinus. (R. at 276.) Berry continued to complain of headaches centered in the left frontal area, despite being able to breathe clearly through his nose. (R. at 276.) Dr. Wade, an otolaryngologist, prescribed Berry with Nasonex and Lortab and instructed Berry to return for a follow-up in six days. (R. at 276.)

On September 6, 2006, Berry returned for his follow-up complaining of pain behind his eyes, but noted that he felt better. (R. at 275.) Upon examination, Dr. Wade opined that Berry's sinusitis had improved and that he was tolerating the Augmentin well. (R. at 275.) Dr. Wade prescribed a course of prednisone, and gave Berry a work excuse to return to work on September 10. (R. at 275.) Berry was asked to return for a follow-up in three weeks. (R. at 275.)

On September 13, 2006, Berry's wife called to request that Berry be given more pain medication, as he was still experiencing a greenish mucus discharge from his sinuses, as well as pain around both eyes. (R. at 275.) On October 12, 2006, Berry returned to Dr. Neal, an associate of Dr. Wade, complaining of recurrent acute sinusitis. (R. at 274.) Dr. Neal opined that Berry may need to consider endoscopic sinus surgery. (R. at 274.) On October 27, 2006, Berry returned for a follow-up. (R. at 273.) His complaints were consistent with his previous visits, as he still complained of pressure in his nose, congestion, headaches between the eyes, in addition to a yellow/green nasal discharge. (R. at 273.) CT scans of Berry's sinuses showed extensive chronic sinusitis. (R. at 273.) Berry's last visit came on November 16, 2006, where it was noted that he was scheduled for surgery with Dr. Thomas Boeve,

19

M.D., the following week. (R. at 273). At this visit, Berry asked for more Lortab. (R. at 272.) Dr. Neal stated that he was worried about the fact that Berry was regularly taking pain medication, explaining that such a practice could be addictive and become less effective when taken on a regular basis. (R. at 272.) Dr. Neal opined that, in addition to his chronic sinusitis, Berry had headaches for multiple reasons including a history of migraines and facial muscle and jaw pain. (R. at 272.) Dr. Neal further opined that, based on his own past experience, Berry's sinusitis was causing very few of his bad headaches. (R. at 272.)

On November 28, 2006, Berry presented to Dr. Boeve at the Highlands Ear, Nose & Throat Group, with complaints of sinusitis, upon referral by Dr. Wade. (R. at 286.) After examination, Dr. Boeve diagnosed Berry with chronic versus recurrent sinusitis with CT documentation of the disease, in addition to laryngopharyngeal reflux. (R. at 287.) Dr. Boeve stated that he was going to place Berry on Augmentin for four weeks with Nasonex and saline irrigations. (R. at 287.) He also provided Berry with 50 pills of Lortab 5.0 mg, which Berry had requested and scheduled to see Berry in four to six weeks with a final CT. (R. at 287.) Dr. Boeve noted that if Berry continued to show the disease at that point, he would continue stealth imaging and plans for surgery. (R. at 287.)

On January 29, 2007, Berry returned to Dr. Boeve complaining of his long-standing sinus disease. (R. at 285.) Berry continued to ask for pain medication, which Dr. Boeve denied. (R. at 285.) Dr. Boeve's medical impressions included chronic maxillary and ethmoid sinusitis, severe nasoseptal deviation to the right and large left

20

concha bullosa cell with hypertrophic middle and inferior turbinates. (R. at 285.) After discussing the indications, risks, benefits and technique of stealth-guided maxillary antrostomy with Berry, Berry indicated that he wished to proceed with such surgery. (R. at 285.)

From August 21, 2006, through December 12, 2006, Berry underwent treatment for shoulder pain at Saltville Medical Center. (R. at 279-284.) On August 21, 2006, Berry presented to Dr. Alvarado with complaints of chronic right shoulder pain, requesting asked for pain medication. (R. at 282.) Dr. Alvarado noted that Berry "comes in expecting us to believe his story without any documents or any meds." (R. at 282.) Dr. Alvarado further stated that "it is very difficult to believe these patients that expect us to believe whatever they tell us considering that they are asking for narcotic meds." (R. at 282.) Dr. Alvarado stated that Berry had to be "more objective and respectful of our situation and conditions as practitioners." (R. at 282.) Dr. Alvarado noted that Berry had been taking Lortab but he ran out about two weeks ago and had since been taking four to five pills of Tylenol daily. (R. at 282.) Upon examination, Dr. Alvarado noted that Berry had chronic pain in his right shoulder since the operation and that he had neuropathic pain involving the territory of the median nerve and maybe some part of the axillary nerve. (R. at 282.) Dr. Alvarado advised Berry that he would not be seeing any more patients for pain management, but he would give him a couple weeks of Lortab 7.5/500 mg to take until he could find another practitioner to take care of his problems. (R. at 282.)

21

On December 6, 2006, Berry returned to Saltville with continued complaints of shoulder pain. (R. at 281.) Dr. Alvarado stated that Berry had significant weakness of the shoulder, as he could hardly manage to get to 90 degrees. (R. at 281.) Dr. Alvarado opined that this could be due to damage of the rotator cuff in the shoulder. (R. at 281.) Dr. Alvarado agreed to review his MRI and prescribe his medication. (R. at 281.) Dr. Alvarado prescribed Lortab 7.5/500 mg, at three per day for 10 days. (R. at 281.) Dr. Alvarado stated that in the meantime, he would get the MRI report so that he could figure out a solution to Berry's ailments, rather than continue prescribing him pain medication. (R. at 281.)

On December 12, 2006, Berry returned to Saltville with complaints of shoulder pain. (R. at 279.) Dr. Powers stated that "it is clear that the patient had arthroscopic surgery on his shoulder about a year ago and he has chronic pain since that time." (R. at 279.) Dr. Powers noted that Berry did not provide a straight answer to any routine questions, and he rapidly digressed to what other doctors had said as to how long he has had this problem, explaining that Berry was very vague about other doctors that he had seen. (R. at 279.) Dr. Powers further noted that Berry appeared to be intoxicated or over medicated. (R. at 279.) Dr. Powers denied Berry's request for pain medication, stating that he needed several types of information before writing a pain prescription, including the names of all doctors he had seen in the past year, all x-ray reports for the last year, a urine drug test and release of information for the prescription monitoring program database. (R. at 279.) Upon hearing this, Berry stated that he would go back to Dr. Alvarado, and Berry subsequently walked out of the exam room without further conversation or response. (R. at 279.)

On December 31, 2006, Dr. Alvarado reviewed the findings of Berry's right shoulder MRI examination and noted moderately severe to severe tendonopathy and a focal tear of the tendon. (R. at 279.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national

economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 16, 2007, the ALJ denied Berry's claims. (R. at 12-21.) The ALJ found that Berry met the insured status requirements of the Act for DIB purposes through December 31, 2009. (R. at 14.) The ALJ also found that Berry had not engaged in substantial gainful activity since September 1, 2004, the alleged onset date. (R. at 14.) The ALJ found that Berry suffered from a severe impairment, namely a depressive disorder, a generalized anxiety disorder and depression. (R. at 14.) The ALJ found, however, that Berry did not have an impairment or combination of impairments that met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ found that Berry retained the residual functional capacity to perform the exertional demands of simple, unskilled light work which did not expose Berry to high stress. (R. at 16.) Thus, the ALJ found that Berry could not perform his past relevant work as custodian, landscape laborer, machine operator and muffler welder. (R. at 19.) Based on Berry's age, education, work history, residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the regional and national economies that Berry could perform, including those of cleaner, stock clerk, food service laborer, general laborer and hand packer. (R. at 20.) Therefore, the ALJ concluded that Berry was not under a disability as defined by the Act, and that he was not entitled to benefits. (R. at 20.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

Berry argues that the ALJ's decision was not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-7.) Specifically, Berry argues that the ALJ failed to consider all of the evidence of record because he did not specifically discuss Dr. Alvarado's December 31, 2006, treatment note. (Plaintiff's Brief at 6-7.) Second, Berry argues that he was not properly informed of his right to representation prior to waiving that right at the administrative hearing and that such lack of representation was prejudicial. (Plaintiff's Brief at 7-8.) Third, Berry argues that substantial evidence does not support the findings by the ALJ regarding his mental impairments. (Plaintiff's Brief at 9-10.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the

weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Berry's argument that he was not properly informed of his right to representation prior to waiving that right at the administrative hearing and that such lack of representation was prejudicial. (Plaintiff's Brief at 7-8.) Under the terms of the Social Security Act, claimants may be represented at an administrative hearing by an attorney or by another person who meets standards set forth by the Secretary. 42 U.S.C.A. § 406. However, there is no requirement that a social security benefits claimant be represented by counsel, and the lack of such representation has been held not to be a denial of due process. *Bishop v. Weinberger*, 380 F. Supp. 293 (E.D.Va. 1974). In fact, most social security claimants appear without the assistance of counsel. *Green v Weinberger*, 500 F.2d 203 (5th Cir. 1974). It has been held that the absence of attorney representation at a social security benefits hearing, without a showing of prejudice or unfairness to the claimant during the course of the hearing, would not be grounds to remand the case to the Secretary for further proceedings. *Sims v. Harris*, 631 F.2d 26 (4th Cir. 1980).

Upon receiving a valid waiver of a claimant's right to counsel in a social security hearing, an ALJ has a heightened duty to scrupulously and conscientiously probe into,

Case 1:08-cv-00005-GMW-PMS   Document 21   Filed 01/07/09   Page 26 of 36   Pageid#: 414

inquire of, and explore for all the relevant facts; failure to carry out this duty precipitates a decision not informed by sufficient facts, one that consequently is considered unsupported by substantial evidence. Social Security Act, § 206, 42 U.S.C.A. § 406.

The undersigned finds that Berry was fully informed of his right to representation throughout the administrative hearing process. Prior to his January 11, 2007, hearing, Berry received two hearing notices, each containing an explanation of his right to representation. Each notice stated:

> **You May Choose To Have A Person Represent You**
>
> If you want to have a representative, please get one right away. You should show this notice to anyone you may appoint. You or that person should also call this office to give us his or her name, address, and telephone number.

Furthermore, according to the record, Berry has an eleventh grade education, thus, this Court will make the assumption that Berry can read and understand the English language. Additional evidence, as stated by the Commissioner, shows that the ALJ previously postponed Berry's first hearing, originally scheduled for October 24, 2006, to allow Berry time to obtain counsel. (Defendant's Brief at 18.) At the January 11, 2007, hearing, the ALJ stated:

> Mr. Berry, I know you have asked on a prior occasion when the case was scheduled for a hearing for an opportunity to obtain an attorney or representative to represent you at the hearing. You are here today with[out] an attorney or representative. Is it your choice to proceed without a formal representative?

27

(R. at 291.) In response, Berry replied "Yes." (R. at 291.) Such an exchange evidences the fact that Berry knew of his right to a representative and voluntarily chose to proceed without representation. Berry's claim that, because of his "borderline intelligence," he did not understand both his right to and the availability of counsel is not persuasive.

In addition to finding that Berry was fully informed of his right to representation throughout the administrative hearing process, the undersigned also finds that the lack of representation was not prejudicial. Berry argues that the ALJ improperly failed to present the vocational expert, Donna Bardsley, with certain restrictions contained in the state agency psychologists' mental residual functional capacity assessment forms. (Plaintiff's Brief at 8.) Berry further argues that the omitted restrictions are the type of restrictions which vocational experts frequently find to preclude claimants from work. (Plaintiff's Brief at 8.)

As stated earlier, at the administrative hearing, Bardsley classified Berry's past relevant work as a custodian as medium and unskilled work and his work as a landscape laborer as heavy and unskilled. (R. at 310.) In addition, his work as a yarn machine operator and muffler welder was classified as medium and semi-skilled. (R. at 310.) Bardsley was asked to consider a hypothetical individual of Berry's age, education and work history who could perform light work, but who could perform only *simple, low stress unskilled jobs, and jobs that would not require him to be exposed to high production quotas*, nor would he be able to work with the general public on a regular basis. (R. at 310-11.) (emphasis added.) Bardsley testified that such an

28

individual could perform work as a cleaner, stock clerk, food service worker, general laborer and hand packager. (R. at 311.)

While Berry does not elaborate on which specific limitations he claims were omitted by the ALJ, it is pertinent to examine the assessment form used by the state agency psychologists. Section I of the Mental Residual Functional Capacity Assessment form is entitled "Limitations." This section is defined as "merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of the documentation and **does not constitute the RFC assessment**."[5] Section III is entitled "Functional Capacity Assessment" and is

> for recording the mental RFC determination. POMS DI 24510.060. It is in this section that the **actual mental RFC assessment is recorded,** explaining the conclusions indicated in Section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings.

POMS DI 24510.060. In addition, Section III should not include **any "severity ratings** or **nonspecific** qualifying **terms** (e.g., moderate, moderately severe) to describe limitations. Such terms do not describe function and do not usefully convey the extent of capacity limitation." POMS DI 24510.065. Therefore, it is clear from the POMS that Section III is where state agency psychologists make their actual findings, whereby Section I is merely a guide.

---

[5] This explanation can be found in Social Security Administration's Program Operations Manual System (POMS), section DI 24510.060.

29

In Section III of the form, the state agency psychologists, Leizer and Jennings, both opined that Berry had a substance abuse disorder in addition to his other medically determinable impairments, and if he discontinued the substance abuse, his remaining functional limitations would no longer be disabling. (R. at 231, 248.) At the administrative hearing, the ALJ presented a limitation to the vocational expert that included "simple, low stress unskilled jobs, and jobs that would not require him to be exposed to high production quotas." (R. at 310-11.) The Commissioner argues that such a limitation is even more restrictive than the state agency psychologists' findings that, absent substance abuse, Berry could perform the mental demands of competitive work. (Defendant's Brief at 21.) The undersigned finds this argument persuasive, as the ALJ was not required to include any limitations noted in Section I of the mental residual functional capacity form, as indicated by the POMS. Additionally, the ALJ must consider, but is not bound by, any findings made by state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i). Thus, the omission of additional restrictions made by the state agency psychologists to the vocational expert is not prejudicial, as the ALJ was not required to use such limitations.

Berry additionally argues that his non-responsiveness to the ALJ in certain instances would have been different had he been represented by counsel, and thus the lack of representation was prejudicial to his case. Specifically, Berry argues that the ALJ found his credibility reduced in part because of his failure to complete a written personality test. (Plaintiff's Brief at 8.) Also, Berry contends that he was prejudiced because he did not respond to the ALJ's March 2, 2007, notice that the ALJ had secured additional medical evidence from Saltville. (Plaintiff's Brief at 8.) The

Case 1:08-cv-00005-GMW-PMS   Document 21   Filed 01/07/09   Page 30 of 36   Pageid#: 418

undersigned finds neither of these arguments convincing. The notion that Berry would have responded differently, or at all, had he been represented by counsel undermines the concept of a knowing and voluntary waiver of counsel. As stated earlier, Berry was not only aware of his right to representation, but had even asked for postponement of the administrative hearing in order to obtain representation. The fact that Berry was unable to garner representation does not equate to an establishment of de facto prejudice. This court cannot speculate as to how a case would have been handled differently with representation, but rather, as stated in the Social Security Act,

> [u]pon receiving a valid waiver of a claimant's right to counsel in a social security hearing, an ALJ has a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts; failure to carry out this duty precipitates a decision not informed by sufficient facts, one that consequently is considered unsupported by substantial evidence.

Social Security Act, § 206, 42 U.S.C.A. § 406.

Second, Berry argues that substantial evidence does not support the findings by the ALJ regarding his mental impairments. (Plaintiff's Brief at 9-10). Specifically, Berry argues that the ALJ should have included specific limitations such as "none," "mild" or "moderate" in his hypothetical questions to the vocational expert, in order to determine whether jobs exist at which Berry could work. (Plaintiff's Brief at 9.)

As stated earlier, such specific limitations referred to by Berry are found in Section I of the state agency psychologists' mental residual functional capacity assessment form and this section is "merely a worksheet to aid in deciding the presence

31

and degree of functional limitations and the adequacy of the documentation and **does not constitute the RFC assessment**." POMS DI 24510.060. Rather, the ALJ relies on the findings in Section III, which should not include **any "severity ratings** or **nonspecific** qualifying **terms** (e.g., moderate, moderately severe) to describe limitations. Such terms do not describe function and do not usefully convey the extent of capacity limitation." POMS DI 24510.065.

The ALJ also asked Bardsley to assume the claimant's mental impairments were at a severity such that he had a GAF score of 50. (R. at 311.) In addition, the ALJ asked Bardsely to assume that the claimant had moderate, or least moderately severe impairments in his ability to concentrate and persist at work tasks, in addition to social interaction and in dealing with work stresses. (R. at 311.) Bardsley stated that there would be no jobs at that level of impairment. (R. at 311-312.) Berry argues that because the ALJ presented the specific limitation of "moderately" to Bardsley in his second line of questioning, this "underscores the necessity for the ALJ to present specific findings of mental capacity or physical capacity instead of presenting the kinds of jobs he feels the claimant can do and then asking for specific ones." (Plaintiff's Brief at 10.) The undersigned does not find this argument persuasive, as the ALJ was neither under the obligation to present a specific mental limitation, such as "moderately," to Bardsley, nor did he rely on Bardsley's testimony in response to these limitations. Additionally, the ALJ must only consider, but is not bound by, any findings made by state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).

32

Berry also argues that the ALJ erred by not giving significant weight to Mr. Stanley's determination that Berry had a GAF score of 50. (Plaintiff's Brief at 10-11.) As stated earlier, "a GAF of 41-50 indicates that the individual has serious symptoms or serious impairments in social, occupational, or school functioning...." DSM-IV at 32. In addition, Mr. Stanley opined that Berry had only mild to moderate ability maintaining concentration and persistence, social interaction and adaptation. (R. at 18.) In his findings, the ALJ stated that "[a]lthough Mr. Stanley indicated a GAF of 50 when he evaluated the claimant on January 11, 2006, such GAF would indicate serious symptoms or serious impairment and this is certainly not consistent with his assessment that the claimant had only mild to moderate ability maintaining social interaction." (R. at 18.) The undersigned agrees with the ALJ's assessment that Mr. Stanley's GAF score was inconsistent with his assessment that Berry had only "mild to moderate ability maintaining social interaction." (R. at 18.) Therefore, the ALJ did not err in according a lesser weight to such a score.

Third, Berry argues that the ALJ's decision was not supported by substantial evidence. (Plaintiff's Brief at 6-7.) Specifically, Berry argues that the ALJ failed to consider all of the evidence of record because he did not specifically discuss Dr. Alvarado's December 31, 2006, treatment note. (Plaintiff's Brief at 6-7.)

In evaluating a disability claim, the ALJ must "consider all evidence in [a claimaint's] case record when [he] make[s] a determination or decision" as to disability. 20 C.F.R. §§ 404.1520(a)(3), 416.1453(a). In addition, "in determining whether [a claimant is] disabled, [the ALJ] consider[s] all your symptoms, including

33

pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529, 416.1450. Among this evidence "include[s] statements or reports from [the claimant], [the] treating or nontreating source, and others about [the claimant's] medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how [the claimant's] impairment(s) and any related symptoms affect [the] ability to work." 20 C.F.R. §§ 404.1529, 416.1450.

The undersigned is of the opinion that the ALJ should have considered Berry's medical records from Saltville upon making his determination that Berry could perform light work. The ALJ had a duty to consider all the evidence of record in making his determination, and Berry has demonstrated that such evidence could have impacted the ALJ's decision. It is clear from the record that Berry experienced significant shoulder pain. (R. at 270-71, 279-84, 298-99.)

As stated previously, Berry underwent treatment for shoulder pain at Saltville from August 21, 2006, through December 12, 2006. (R. at 279-284.) On August 21, 2006, Berry presented to Dr. Alvarado with complaints of chronic right shoulder pain, and asked for pain medication. (R. at 282.) Upon examination, Dr. Alvarado noted that Berry had chronic pain in his right shoulder since the operation, and had neuropathic pain involving the territory of the median nerve and maybe some part of the axillary nerve. (R. at 282.)

34

On December 6, 2006, Berry returned to Saltville with continued complaints of shoulder pain. (R. at 281.) Dr. Alvarado stated that Berry had significant weakness of the shoulder, as he could hardly manage to get to 90 degrees. (R. at 281.) Dr. Alvarado opined that this could be due to damage of the rotator cuff in the shoulder. (R. at 281.) Dr. Alvarado agreed to review his MRI and prescribed Berry Lortab 7.5/500 mg, at three per day for 10 days. (R. at 281.) Dr. Alvarado stated that in the meantime, he would get the MRI report so that he could figure out a solution to Berry's ailments, rather than continue prescribing him pain medication. (R. at 281.)

On December 12, 2006, Berry returned to Saltville with complaints of shoulder pain. (R. at 279.) Dr. Powers stated that "it is clear that the patient had arthroscopic surgery on his shoulder about a year ago and he has chronic pain since that time." (R. at 279.) On December 31, 2006, Dr. Alvarado reviewed the findings of Berry's right shoulder MRI examination and noted moderately severe to severe tendonopathy and a focal tear of the tendon. (R. at 279.)

Even if Berry's alleged shoulder pain did not prevent him from being able to perform light work, the ALJ still had a duty to consider this as evidence of record in making his disability determination. The Commissioner cites evidence "that Plaintiff's complaints of pain were being made in an attempt to obtain narcotic medications and not because he had disabling shoulder pain." (Plaintiff's Brief at 16.) While there is evidence of this allegation, Berry's potential drug addiction is immaterial to whether the ALJ had a duty to consider Berry's medical records relating to his shoulder in making a disability determination. It is clear from the record that Berry did have

35

significant damage to his shoulder, (R. at 279), and the pain was significant enough for Dr. Alvarado to prescribe narcotic medication. (R. at 281.) Whether or not Berry developed an addiction to this medication, concurrent with his shoulder injury, is a separate issue from his ability to lift with good use of both arms. As evidenced by the ALJ's decision, the ALJ failed to consider Berry's medical records from Saltville regarding his shoulder injury. (R. at 12-21.) Thus, the undersigned finds that the ALJ should have considered Berry's medical records relating to his shoulder in making his disability determination.

## IV. Conclusion

For the foregoing reasons, I will deny the Commissioner's motion for summary judgment. The Commissioner's decision denying benefits will be vacated, and the case will be remanded to the ALJ for further consideration of Berry's medical records from Saltville in making a determination of his ability to work.

An appropriate order will be entered.

**ENTER:** This 7th day of January, 2009.

/s/ Glen M. Williams
SENIOR UNITED STATES DISTRICT JUDGE